UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

**DOUG N. ZOLTANI**,                                    Case No. 3:11 CV 1900

             Plaintiff,                            Judge James G. Carr

     v.                                          REPORT AND RECOMMENDATION

**COMMISSIONER OF SOCIAL SECURITY,**

             Defendant.                           Magistrate Judge James R. Knepp, II

### INTRODUCTION

Plaintiff Doug Zoltani appeals the administrative denial of Disability Insurance Benefits (DIB) under 42 U.S.C. § 405(g). The district court has jurisdiction over this case under 42 U.S.C. § 405(g). This matter was referred to the undersigned for the filing of a report and recommendation pursuant to Local Rule 72.2. (Non-document entry dated September 9, 2011). For the reasons given below, the undersigned recommends the case be remanded to the Commissioner.

### BACKGROUND

Plaintiff filed an application for DIB on May 22, 2007, alleging a disability onset date of September 15, 2005. (Tr. 153–155). His application was denied initially (Tr. 90) and upon reconsideration (Tr. 95). Plaintiff requested a hearing before an Administrative Law Judge (ALJ). (Tr. 98). Born in April 1962, Plaintiff was 47 years old at the time of the ALJ's hearing. (Tr. 32).

Medical History

Plaintiff's primary medical issue giving rise to his application for benefits is neurocardiogenic syncope, otherwise known as the common faint. (Tr. 273). Plaintiff also alleges problems with fatigue, concentration, constant pain, numbness in his extremities, and dizziness.

(Tr. 177, 200, 211). He was reportedly medically discharged from the Navy because of headaches. (Tr. 249). According to SSA forms Plaintiff filled out, it takes him much longer to get anything done due to a lack of energy, and he now needs twelve hours of sleep a night with a one-hour nap during the day. (Tr. 193, 197).

Plaintiff was taken to the emergency room by ambulance in September 2005 (his alleged onset date) complaining of severe weakness. (Tr. 239). Plaintiff had collapsed on the floor in his bathroom and was unable to get up. (Tr. 239). The attending physician noted a history of sinus problems and reported "[a]ll other systems were reviewed and are otherwise negative." (Tr. 239). Plaintiff reportedly had difficulty getting himself to a sitting position while being examined. (Tr. 239). An echocardiogram indicated syncope. (Tr. 326). Sinus x-rays showed bilateral maxillary sinusitis. (Tr. 237). The radiologist noted this was "severe bilateral maxillary sinusitis." (Tr. 241). Plaintiff was prescribed antibiotics and pain medication and instructed to follow up with his primary care physician. (Tr. 237). When he did so, in October 2005, Plaintiff's primary care physician, Adrienne Sedlmeier, M.D., ordered a sinus CT, which showed extensive mucosal thickening and mucus in the maxillary sinuses bilaterally. (Tr. 235). The radiologist's impression from the scan was pansinusitis – reportedly also demonstrated on a previous CT scan from October 2003. (Tr. 235). The radiologist noted these "findings most likely represent chronic sinusitis." (Tr. 235).

Plaintiff was admitted to St. Luke's Hospital in November 2005 with a diagnosis of syncope. (Tr. 223). A tilt table test was conducted, during which Plaintiff "had syncope accompanied by a 9 second pause." (Tr. 225). The test was therefore positive, but "no complications were noted." (Tr. 224–225). Plaintiff was advised to increase his salt and water intake and follow up with his primary care physician. (Tr. 225).

2

In November 2005, Plaintiff saw otolaryngologist Gary Coleman, M.D., for ongoing sinus problems. (Tr. 227–231). Dr. Coleman noted this has been a "lifelong problem" for Plaintiff, aggravated by tobacco smoke. (Tr. 227). According to Dr. Coleman's notes, Plaintiff's condition involves face pain, headaches, nasal congestion, dizziness, and fatigue. (Tr. 227). On examination, Dr. Coleman noted mostly normal findings, but reported Plaintiff's anterior maxilla was tender bilaterally. (Tr. 229). He also reported Plaintiff's septum is deviated to the right and his left middle meatus is filled with polypoid material. (Tr. 229). Dr. Coleman ordered a CT scan of Plaintiff's sinuses, which reportedly showed pansinusitis, extensive mucosal thickening, and occluded ostiomeatal complexes. (Tr. 231). The radiologist interpreting this scan, Scott Connin, M.D., determined this "most likely represent[s] chronic sinusitis." (Tr. 231).

In February 2006, Plaintiff underwent an MRI of the brain without contrast. (Tr. 233). This scan reportedly showed increased signal intensity in the frontal, ethmoid, and maxillary sinuses bilaterally, but otherwise nothing abnormal. (Tr. 233). The radiologist interpreting the scan suspected there was fluid in the left sphenoid sinus, and noted an impression of sinusitis and pansinusitis. (Tr. 233).

Also in February 2006, Plaintiff was seen at the Cardiac Electrophysiology and Autonomic Function Clinic in the Center for Heart Science at the Medical University of Ohio on referral for an evaluation of his syncope and fatigue. (Tr. 270–271). Nurse practitioner Beverly Karabin reported Plaintiff complained of a daily aching, a heavy feeling from his elbows to his fingertips and his lower legs, occasional numbness, severe fatigue, and feeling near-syncopal. (Tr. 272). Plaintiff also described "symptoms of brain fog [and] lack of concentration." (Tr. 272). After a normal physical examination, Karabin concurred that Plaintiff "is suffering from a form of autonomic dysfunction

3

consisting of neurocardiogenic syncope", which she described as the common faint caused by a loss of blood pressure in the brain upon standing. (Tr. 273). In sum, she reported "[m]any of the symptoms [Plaintiff] describes are consistent with neurocardiogenic syncope including headaches, temperature intolerance, fatigue, and inability to tolerate long periods of standing, especially showering." (Tr. 273).

At that time, Plaintiff was started on Wellbutrin to stabilize the autonomic nervous system and instructed to do aerobic conditioning and "activities such as swimming, biking, walking[,] and weight resistance training" in order to develop peripheral muscle strength. (Tr. 273). Nurse Karabin noted she had consulted with cardiologist Blair Grubb, M.D. – a "leading national expert[] in autonomic disorders" – and that Dr. Grubb had answered Plaintiff's questions. (Tr. 261, 273, 369). When Plaintiff returned later that month, Karabin still reported complaints of heavy feelings in Plaintiff's extremities and indicated he "continues to be plagued with chronic sinusitis." (Tr. 270). Plaintiff also had to change medications because of personality changes he experienced while taking Wellbutrin. (Tr. 270). Karabin noted Plaintiff was intolerant to Lexapro, beta-blockers, Florinef, and ProAmatine. (Tr. 270, 272).

On referral from Dr. Sedlmeier, Plaintiff was evaluated by neurologist David Szymanski, M.D., in April 2006. (Tr. 254–255). On examination, Dr. Szymanski noted Plaintiff appeared pale and somewhat listless. (Tr. 254). After reviewing his history, Dr. Szymanski ordered an EEG to rule out any underlying seizure activity, ordered blood tests to determine what was causing his generalized weakness and fatigue, and arranged for neuropsychological testing because of Plaintiff's sense of fogginess and cognitive slowing. (Tr. 255).

Pursuant to Dr. Szymanski's recommendation, Plaintiff's cognitive and emotional

4

functioning was evaluated by neuropsychologist Timothy Wynkoop, Ph.D. (Tr. 248–252). Dr. Wynkoop observed Plaintiff to be alert, aware, cooperative, well-behaved, and coherent. (Tr. 249). He noticed no signs of psychosis such as hallucinations or delusions, and considered Plaintiff's reasoning, judgment, and insight to be functional. (Tr. 249). Plaintiff reportedly "sat, stood, and walked without difficulty." (Tr. 250).

Dr. Wynkoop conducted a variety of tests and determined Plaintiff has average general intelligence, maintains attention within normal limits, is slow to read words, has weak word list learning, has language and visuoconstruction within normal limits, has slowed verbal fluency, and needs some help managing finances. (Tr. 250–251). Dr. Wynkoop thought Plaintiff "may suffer neurological [or] musculoskeletal features commonly associated with conversion disorder", but "he does not seem to be experiencing substantial emotional distress." (Tr. 251). Dr. Wynkoop assessed Plaintiff with cognitive disorder not otherwise specified and wanted to rule out conversion-like symptoms. (Tr. 252). He was concerned about Plaintiff's continued driving given his syncope, but recommended he consider a referral to the Bureau of Vocational Rehabilitation "if he wishes to return to work at some point." (Tr. 252).

Plaintiff then returned to Dr. Szymanski, who reported the results of all his testing. (Tr. 256). The laboratory tests he had ordered were all unremarkable. (Tr. 256). The EEG "showed some non-specific cortical irritability but no overt seizure activity." (Tr. 256–257). Because of the nine-second pause associated with Plaintiff's initial syncopal event, Dr. Szymanski opined it may have been associated with global hypoperfusion, which may have left Plaintiff with cognitive slowing. (Tr. 256).

In May 2006, Plaintiff saw neurologist Noor Pirzada, M.D. (Tr. 266). She reported that since

Plaintiff's initial episode, "he has had several presyncopal episodes where he feels that he is going to pass out and everything around goes dark, and this resolves within a few minutes." (Tr. 266). She noted complaints of occasional tingling in the extremities "but not weakness, wasting, fasciculations[,] or clumsiness." (Tr. 266). On examination, Dr. Pirzada found no pallor, no cyanosis, no lymphadenopathy, normal facial weakness, no incoordination, and a slow and deliberate gait. (Tr. 267). Dr. Pirzada agreed with the diagnoses of neurocardiogenic syncope and reported Plaintiff's "response to medications has been less than optimal." (Tr. 267). In order to rule out a peripheral nerve disorder, Dr. Pirzada ordered an EMG and nerve conduction study. (Tr. 267).

Plaintiff returned to the Autonomic Function Clinic for a follow-up in May 2006. (Tr. 268–269). In a letter to Dr. Sedlmeier, nurse Karabin described Plaintiff as a "pleasant but unfortunate" gentleman who suffers from neurocardiogenic syncope, "is miserable with allergic rhinitis", and experiences presyncopal spells. (Tr. 268). Karabin reported normal physical examinations but significant allergies "which exacerbate peripheral blood pooling due to histamine release." (Tr. 269). Karabin suggested blocking histamine response at the H1 and H2 receptors. (Tr. 269).

Later that month, Plaintiff returned to see neurologist Dr. Pirzada. (Tr. 263–264). Because of complaints of numbness and tingling, Plaintiff underwent an EMG and nerve conduction study "which did not show any evidence for peripheral neuropathy in the arms or legs." (Tr. 264). Plaintiff's EMG was deemed normal. (Tr. 265, 364). He also had a normal neurological examination with normal gait and coordination. (Tr. 264). Dr. Pirzada recommended Plaintiff continue seeing his cardiologist for treatment of neurocardiogenic syncope. (Tr. 347).

In September 2006, nurse Karabin wrote a letter to Plaintiff's private disability insurer stating that, although he had not had any syncopal episodes recently, "he continues to complain of dizziness". (Tr. 262). At that time, nurse Karabin suggested Plaintiff "be considered disabled for approximately 3 months" so that his response to new medications could be determined. (Tr. 262). In a letter to Dr. Sedlmeier that month, nurse Karabin explained she believed Plaintiff "continues to be plagued with neurocardiogenic syncope" and has developed sleep disturbance. (Tr. 263). Karabin noted Plaintiff was found to have nothing neurologically that would be contributing to his symptoms. (Tr. 342). She referred Plaintiff to physical therapy for strengthening and conditioning. (Tr. 263).

In February 2007, Plaintiff returned to see cardiologist Dr. Grubb at the Autonomic Function Clinic. (Tr. 260). Dr. Grubb noted Plaintiff's recurrent neurocardiogenic syncope and reported "he has been intolerant to many of the normal medical therapies". (Tr. 260). Dr. Grubb prescribed a generic version of Adderall to help Plaintiff "become more active" and "embark upon a more ambitious reconditioning program." (Tr. 260, 338). Not long thereafter, Dr. Sedlmeier filled out a form for SSA in which she explained Plaintiff "has severe generalized weakness due to neurocardiogenic syncope. This also causes fatigue and slowness. . . . [H]is thought processes are slowed due to low blood pressure. . . . Most people eventually respond to treatment and this patient has not even though [he has been] seen by specialists in this field." (Tr. 279).

An SSA employee conducted a face-to-face interview with Plaintiff in May 2007 and noticed Plaintiff had difficulty concentrating and answering questions. (Tr. 166). Plaintiff reportedly "would take long pauses before answering as well as take long periods of time to complete his answer, providing information" unresponsive to what was asked. (Tr. 167). At a later face-to-face interview

7

in October 2007, Plaintiff was reportedly "very articulate" though he needed "to slow down his thinking process at some times". (Tr. 187).

In August 2007, Plaintiff returned to the Autonomic Function Clinic to see Dr. Grubb and nurse Karabin. (Tr. 298–299). At that time, Karabin reported the Adderall Dr. Grubb prescribed had caused headaches, and Plaintiff continued "to experience fatigue, exercise intolerance, and dizziness almost daily." (Tr. 298). Karabin added Mestinon to Plaintiff's medications to increase his blood pressure without causing supine hypertension. (Tr. 298).

In November 2007, Dr. Grubb filled out a treating physician statement in support of Plaintiff's claim of disability for purposes of his private disability insurance. (Tr. 329–331). In this statement, Dr. Grubb recited his diagnosis of neurocardiogenic syncope and said Plaintiff has symptoms of dizziness, lightheadedness, weakness, poor concentration, fatigue, and diminished exercise tolerance. (Tr. 329). He indicated Plaintiff could sit for eight hours, stand for four hours, and walk for four hours, all intermittently instead of continuously. (Tr. 330). He indicated Plaintiff could not climb, twist, bend, stoop, reach above shoulder level, or operate a motor vehicle, but also that he could lift up to 20 pounds occasionally. (Tr. 330). Dr. Grubb concluded Plaintiff could work a total of four to six hours per day. (Tr. 330). When asked whether he expects improvement, Dr. Grubb noted Plaintiff's intermittent fatigue and near syncope are unpredictable. (Tr. 330).

At a followup with nurse Karabin in May 2008, Plaintiff had another normal examination and was noted to be "stable from a syncopal standpoint", but reportedly continued "to suffer from autonomic decompensation resulting in fatigue, dizziness, brain fog, and cognitive impairment." (Tr. 336). Karabin then added Levsin to Plaintiff's medications in order to boost in his blood pressure. (Tr. 336).

8

In February 2009, Dr. Grubb wrote a letter to Plaintiff's attorney handling his private disability insurance dispute. (Tr. 328). In it, Dr. Grubb explained he considers Plaintiff disabled because he "suffers from a severe orthostatic intolerance syndrome with recurrent episodes of neurocardiogenic syncope" and has "periods of intermittent loss of consciousness with very little warning." (Tr. 328). Dr. Grubb noted he had tried Plaintiff "on numerous medications with little or no effect." (Tr. 328).

In July 2009, Plaintiff's primary care physician, Dr. Sedlmeier, filled out an RFC assessment form for SSA. (Tr. 365–368). She opined Plaintiff could occasionally lift ten pounds, frequently lift less than ten pounds, and stand or walk less than two hours in an eight-hour workday. (Tr. 365–366). She remarked Plaintiff "needs more than the normal rest breaks" and could sit for less than six hours. (Tr. 365–366). Dr. Sedlmeier further noted Plaintiff's ability to push or pull is limited due to weakness, and he could never climb, balance, or crawl. (Tr. 366). She reported his symptoms are severe enough to frequently interfere with the attention and concentration needed to perform simple work tasks, and he needs to spend unpredictable parts of each day lying down. (Tr. 367). On average, she estimated Plaintiff would have to be absent from work four or more days a month. (Tr. 368). Dr. Sedlemeier had previously written multiple letters on Plaintiff's behalf explaining her opinion that his "situation makes it impossible for him to work". (Tr. 369, 371). Dr. Sedlemeier later affirmed her RFC assessment in December 2009. (Tr. 379–382).

Plaintiff has been evaluated by several consultants since applying for DIB. In July 2007, he was referred to Mark Hammerly, Ph.D. by the Bureau of Disability Determination for a psychological evaluation to assess overall functioning and mental status. (Tr. 280). At the interview, Plaintiff told Dr. Hammerly he felt like he "aged from 40 to 80 overnight". (Tr. 281). Dr. Hammerly

9

noted coherent, goal-directed, and logical thought processes and opined Plaintiff did not seem to be trying to manipulate his answers to cast himself in a good or bad light. (Tr. 282). Dr. Hammerly reported Plaintiff showed no motor or autonomic manifestations of anxiety and no evidence of hallucinations, paranoia, delusions, obsessive-compulsive behaviors, dissociative experiences, or other clinically significant somatic concerns. (Tr. 283). He further determined Plaintiff's mental control, concentration, and memory are grossly intact. (Tr. 283). Dr. Hammerly opined "[t]here doesn't appear to be anything psychologically wrong with [Plaintiff.] He is not even depressed over the turn of events surrounding his health; disappointed, certainly, but not depressed in the clinical sense." (Tr. 286). In assessing Plaintiff's functional abilities, Dr. Hammerly noted he has problems completing household and community activities of daily living "due to medical incapacity", but yet he associates with friends often, keeps track of his finances, participates in raising his children, and seeks out community services on his own. (Tr. 286).

Dr. Hammerly determined Plaintiff's ability to relate to others; his ability to understand, remember, and follow instructions; his ability to maintain concentration, persistence, and pace; and his ability to withstand the stress and pressures associated with day-to-day work activity are not impaired for any psychological reason. (Tr. 287). Dr. Hammerly assigned Plaintiff a GAF score of 61. (Tr. 286).

The same month, Plaintiff was seen by medical consultant Rekha Trivedi, M.D. at the request of the Bureau of Disability Determination (Tr. 291–296). Dr. Trivedi noted Plaintiff's complaints of elbow pain upon flexion, but on examination found no edema, tenderness, swelling, spasm, atrophy, varicosities, or skin color changes. (Tr. 292, 294). She found Plaintiff's range of motion to be almost normal, with Plaintiff having slight trouble extending his cervical spine because of

10

dizziness. (Tr. 293). In terms of Plaintiff's neuromuscular functioning, Dr. Trivedi noted Plaintiff "is able to rise from the chair and is independent in transfers", is able to reach over his head, and is able to walk on both his heels and his toes. (Tr. 295). She recorded a clinical impression of fatigue and dizziness, but reported her examination of Plaintiff "revealed no sensory or reflex impairment". (Tr. 296). Dr. Trivedi concluded Plaintiff "is able to speak, hear, travel, handle objects, sit, stand, and walk with frequent rest periods." (Tr. 296).

In August 2007, Plaintiff's mental RFC was assessed by consultant psychologist Bruce Goldsmith, Ph.D. (Tr. 300–313). Dr. Goldsmith determined Plaintiff has at most mild restrictions in any functional area. (Tr. 300, 310). Dr. Goldsmith noted the evaluations by Drs. Hammerly and Wynkoop show Planitiff's psychological condition to be not severe. (Tr. 312).

Also in August 2007, Plaintiff's physical RFC was assessed by medical consultant Walter Holbrook, M.D. (Tr. 314–321). Dr. Holbrook determined Plaintiff has no established exertional, postural, manipulative, visual, or communicative limitations. (Tr. 318). In reaching this conclusion, he noted Plaintiff "has had numerous ER visits for dizziness", but his "exams are normal w[ith] signs of fatigue and dizziness." (Tr. 318). Dr. Holbrook further noted Plaintiff's exams show a normal range of motion and strength throughout his extremities and spine, a normal gait, and no swelling, spasm, or atrophy. (Tr. 318). Nonetheless, Dr. Holbrook considered Plaintiff's pain and determined his statements credible. (Tr. 318–319).

Administrative Hearing

Plaintiff appeared with counsel at a teleconference hearing before the ALJ on January 28, 2010. (Tr. 28). Also appearing was medical expert (ME) John Ruggiano, M.D. and vocational expert

11

(VE) Amy Vercillo. (Tr. 28).

Plaintiff testified he lives with his wife and three children. (Tr. 31). He said he depends on his children for "a lot of help" with daily tasks. (Tr. 32). In terms of his vocational training, Plaintiff explained he spent about two years in college at the Florida Institute of Technology, and was in the Navy where he received electrical and nuclear power training. (Tr. 33). He last worked in September 2005 as a drug store manager, but received private disability insurance until 2008 when the insurer denied his disability claim. (Tr. 34–35). Plaintiff testified he spends a few hours a week doing photography as a hobby. (Tr. 36–37). He used to be a wedding photographer. (Tr. 77).

When asked why he is unable to work, Plaintiff responded his neurocardiogenic syncope, dizziness, fatigue, weakness, and related symptoms prevent him from working. (Tr. 37–38). Plaintiff testified that because his legs hurt too much and his brain does not direct his blood flow properly, he is only able to stand for ten or fifteen minutes, though maybe longer if holding onto something to maintain balance. (Tr. 42–43). He said he could sit for about an hour on a good day but is limited by pain. (Tr. 43, 59). He further stated he could walk around the block, lift ten or fifteen pounds, and carry a grocery bag for about fifteen feet if he pushes himself. (Tr. 44). He said he drives about twice a week, but never for longer than about 20 minutes. (Tr. 44–45). His doctors initially recommended he not drive but said it was okay around 2008 when Plaintiff regained some strength. (Tr. 45).

On average, Plaintiff testified he stays in bed for twelve to fourteen hours a night. (Tr. 45). On a typical day, he said he will fix his own breakfast, take a shower, get dressed, then eat a lunch prepared by either his kids or his wife, take an hour nap, help his kids with schoolwork, prepare dinner, do some laundry, maybe watch a movie or read, and sometimes do vacuuming or dishwashing. (Tr. 46–49). Plaintiff said he can only do most of these activities for

12

five to fifteen minutes before needing to take a break. (Tr. 59). About twice a week, Plaintiff socializes with friends or neighbors who come to see him. (Tr. 50). He goes shopping "probably once a week", but cannot do all the shopping at once because he needs to rest, and he does not go shopping alone. (Tr. 50–51, 57). On a bad day, Plaintiff said he will go right back to bed or lie on the couch after eating breakfast and taking a shower. (Tr. 57–58).

Plaintiff explained he does things slower on purpose to help prevent passing out. (Tr. 51). He said he passed out probably twice in the two years preceding the hearing, the last time being in the summer of 2009. (Tr. 52). Plaintiff said when he does pass out, he may be unconscious for several minutes. (Tr. 53). Plaintiff has warning signs before passing out; he gets hot and lightheaded. (Tr. 54). He testified he experiences lightheadedness with regularity, and that moving quickly, walking up inclines, or being extremely hot brings it on. (Tr. 55, 63). He also said stress can cause his syncope. (Tr. 62). Plaintiff reportedly takes precautions to avoid syncope more than once every day. (Tr. 55). If Plaintiff were working, he said he would need a cot so he could lie down. (Tr. 61).

The ME who testified, Dr. Ruggiano, is a board-certified psychiatrist. (Tr. 63). He testified Plaintiff's diagnosis for syncope is fairly well-established since November 2005 based on the positive tilt table test and his blood pressure. (Tr. 65). Though Plaintiff's syncope is clear from the record, the ME opined Plaintiff's psychomotor slowing, pain complaints, weakness, and fatigue are not explained by his syncope and remain unexplained by the record. (Tr. 66, 70). The ME said some of Plaintiff's symptoms may be psychiatric, as evidenced by the cognitive testing in the record, but Plaintiff has received no psychiatric treatment. (Tr. 66–67).

When asked whether the medical evidence shows Plaintiff's impairments meet or equal a listing, the ME said, "well, no, I can't say I even know what's wrong with him." (Tr. 67). The ME

13

referenced Plaintiff's GAF score of 61 to 70, and said it "is about as good as mine". (Tr. 68). The ME admitted on cross examination that Plaintiff's syncope events could cause cognitive slowing because of reduced blood supply in the brain. (Tr. 72–73). As far as physical limitations, the ME suggested Plaintiff avoid heavy machinery and driving. (Tr. 68). The ME concluded that if Plaintiff's condition is as Plaintiff explained in his testimony, he could not engage in activities of a work-like nature. (Tr. 73).

The VE classified Plaintiff's prior work as a store manager and as a photographer as light, skilled work. (Tr. 75). According to the VE, the store manager position had significant transferrable skills in financial management and inventory management. (Tr. 75–75). The ALJ then posed a hypothetical question to the VE, asking her to assume an individual of the same age, educational background, work history, and transferrable skills as Plaintiff, but with the following limitations: could perform only light or sedentary work; must be able to sit or stand in the workplace; could sit or stand for approximately fifteen minutes at a time; could lift at least fifteen pounds; could not climb, work at unprotected heights, or be around open flames or dangerous machinery; and could do simple, routine, repetitive tasks or other novel work functions up to and including semiskilled work. (Tr. 76). Such an individual, the VE said, could not perform Plaintiff's past relevant work because of the sitting, standing, and lifting restrictions. (Tr. 78–79). However, the VE provided examples of light and sedentary semiskilled and unskilled positions that such an individual could still perform: inventory clerk, scheduler, and telephone customer service operator – each of which accounts for thousands of positions in the regional economy. (Tr. 79).

On cross examination, the VE recognized that the DOT does not address a sit/stand option. (Tr. 80). She explained there are jobs like the ones she offered where an individual can sit or stand

14

at their own discretion so long as they are staying on task and their productivity is not affected. (Tr. 80). The VE further testified that being absent two or more days a month is unlikely to be tolerated, especially during a probationary period. (Tr. 82–84). Similarly, the VE said unscheduled breaks of any substantial time would preclude sustained work. (Tr. 84). Plaintiff's attorney then asked a hypothetical whereby the individual is limited to working four to six hours a day, and the VE responded such an individual could perform part-time work in the same positions she previously identified. (Tr. 84–85).

The Commissioner's Decision

The ALJ issued an unfavorable decision on February 23, 2010. (Tr. 12–22). He found Plaintiff met the insured status requirement for DIB through December 31, 2012, but has no impairments that meet or equal a listing and is still capable of performing ample work in the regional economy. (Tr. 15–22). Thus, he found Plaintiff not disabled. (Tr. 22). Plaintiff requested review (Tr. 9), but the Appeals Council denied review on July 7, 2011 (Tr. 1) after incorporating new evidence into the record (Tr. 5), making the ALJ's denial the final decision of the Commissioner.

STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact

15

if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the Court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for DIB is predicated on the existence of a disability. 42 U.S.C. § 423(a)(1)(E). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. §§ 404.1520 and 416.920 – to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering his residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in steps one through four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at step five to

16

establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The Court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is he determined to be disabled. 20 C.F.R. §§ 404.1520(b)–(f), 416.920(b)–(f); *see also Walters*, 127 F.3d at 529.

**DISCUSSION**

Plaintiff now challenges the ALJ's decision on three grounds: that the ALJ erred in his treatment of Plaintiff's treating source opinions; that the ALJ erred in his evaluation of subjective symptoms and Plaintiff's credibility; and that the ALJ's finding at step five is not supported by substantial evidence as a matter of law. These arguments are addressed in turn.

Treating Physician Rule

Plaintiff argues the ALJ erred in his treatment of medical opinions by Plaintiff's physicians Drs. Grubb and Sedlmeier. Generally, the medical opinions of treating physicians are accorded greater deference than those of non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96-2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)). A treating physician's opinion is given "controlling weight" if supported by "medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with

17

other substantial evidence in the case record." *Id.*

The ALJ must give "good reasons" for the weight given to a treating source's opinion. *Id.* The "good reasons" given by an ALJ to discount a treating source's opinion must be "supported by the evidence in the case record". *Id.* at 406–407 (quoting SSR 96-2p, 1996 WL 374188, at *5). A failure to follow this procedural requirement "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Id.* (citing *Rogers*, 486 F.3d at 243). Accordingly, failure to give good reasons requires remand. *Id.* at 409–410.

Under the regulations, a "treating source" includes physicians, psychologists, or "other acceptable medical source[s]" who provide, or have provided, medical treatment or evaluation and who have, or have had, an ongoing treatment relationship with the claimant. 20 C.F.R. § 404.1502. A medical provider is *not* considered a treating source if the claimant's relationship with them is based solely on the claimant's need to obtain a report in support of their claim for disability. 20 C.F.R. § 404.1502.

As the ALJ noted, Dr. Grubb is Plaintiff's treating cardiologist. He saw and treated Plaintiff routinely over the course of several years. (Tr. 260–263, 270–273, 298–299, 328–331). As such, he is a treating source whose opinions are generally entitled to controlling weight absent good reason. The ALJ adopted most of Dr. Grubb's opinions. For instance, Dr. Grubb determined Plaintiff could sit for eight hours, stand for four hours, and walk for four hours, all intermittently. (Tr. 330). He also said Plaintiff could lift up to 20 pounds occasionally. (Tr. 330). The ALJ adopted and fully accommodated these exertional limitations by determining Plaintiff could perform sedentary work – lifting no more than ten pounds and occasionally walking or standing, *see* 20 C.F.R. § 404.1567(a) – with a sit/stand option. (Tr. 19). However, the ALJ declined to adopt Dr. Grubb's statement in the

18

record that Plaintiff could work a total of four to six hours a day, saying Dr. Grubb "gave no objective basis for this limitation and it should be noted that more than two years have passed without, according to the record herein, any significant treatment for cardiac problems." (Tr. 18).

The "good reasons" given by an ALJ to discount a treating source's opinion must be "supported by the evidence in the case record". *Blakley*, 581 F.3d 399, 406–407 (quoting SSR 96-2p, 1996 WL 374188, at *5). In other words, to be a "good reason" for discounting the opinion of a treating physician, the purported reason must at least be factually correct. Here, there is insubstantial support in the record for the proposition that Dr. Grubb provided no objective basis for his limitation. The physician statement referenced by the ALJ had an "objective findings" question, to which Dr. Grubb responded by noting Plaintiff's positive tilt table test in November 2005. (Tr. 329). Dr. Grubb's other treatment notes reported Plaintiff was intolerant to "many of the normal medical therapies" Dr. Grubb employed. (Tr. 260). These facts are an objective basis supplied by Dr. Grubb for his medical opinion that Plaintiff has subjective symptoms such as dizziness, lightheadedness, and fatigue resulting in an inability to work for more than four to six hours a day. (Tr. 329).

As another purported reason for discounting Dr. Grubb's assessment, the ALJ noted that more than two years passed between Dr. Grubb's statement and the ALJ's decision, during which time Plaintiff received "no significant treatment for cardiac problems." (Tr. 18). On review, this determination is also unsupported by substantial evidence and therefore cannot be a "good reason" for discounting Dr. Grubb's opinion. Dr. Grubb gave the four to six hour restriction in November 2007. (Tr. 330–331). After that time, in May 2008, Plaintiff followed up with Dr. Grubb's office and was reportedly "stable from a syncopal standpoint" but continued to suffer from fatigue, dizziness, brain fog, and cognitive impairment. (Tr. 336). The medication Levsin was added to Plaintiff's

19

treatment to boost his blood pressure (*i.e.*, Plaintiff received treatment for his ongoing cardiac problem). (Tr. 336). Moreover, Dr. Grubb wrote a letter in February 2009 opining Plaintiff is disabled and "has consistent fatigue, exercise intolerance, dizziness, and cognitive impairment." (Tr. 328). In other words, Dr. Grubb made a statement fully supporting his earlier limitation a year and a half later. In fact, in that letter, Dr. Grubb mentioned Plaintiff "is a patient that is followed here in the cardiac electrophysiology and autonomic function clinic" – that is, Plaintiff continued to be treated for his cardiac problem by a cardiologist as of February 2009. (Tr. 328).

The record shows Plaintiff's treatment did not become any less significant after Dr. Grubb's November 2007 statement. Rather, Dr. Grubb and his nurse practitioner continued to see Plaintiff and try new medications to improve his symptoms, just as before the November 2007 statement. This ongoing treatment only stopped because Plaintiff could not afford to keep seeing Dr. Grubb. (Tr. 40–41). Therefore, neither reason the ALJ gave to discount Dr. Grubb's opinion is supported by substantial evidence in the record.

With respect to Dr. Sedlmeier, the ALJ said:

> [T]he undersigned has not ignored the opinion of Adrienne Sedlemei[e]r, M.D. Dr. Sedlemei[e]r is [Plaintiff's] primary care physician. She opines that her patient is significantly limited in overall functioning (including lifting, carrying, standing, walking) due to neurocardiogenic syncope. While Social Security Ruling 96-2p provides that the opinion of a treatment physician is to be accorded great weight, that weight is not absolute. Weight is given only where the opinion in question is supported by objective medical evidence, AND where it is not inconsistent with the weight of the evidence. In the instant matter, Dr. Sedlemei[e]r's opinion fails on both counts. No objective medical findings are cited in support of the limitations she proposes. In addition, her opinion is inconsistent with the weight of the evidence. Specifically, the undersigned notes the inconsistencies between her opinion and that of Dr. Grubb, [Plaintiff's] treating cardiologist. Where the condition which allegedly disables [Plaintiff] is related to his heart, the opinion of his treating cardiologist shall be given greater weight than that of his general, primary care physician.

(Tr. 20). On review, the ALJ did not err with his treatment of Dr. Sedlmeier's opinion.

20

Though Plaintiff disagrees with the ALJ's language about a treating physician's opinion being entitled to "great" weight instead of "controlling" weight, the ALJ did correctly note that an opinion of a treating source must be both medically supported and not inconsistent with substantial evidence in the record. (Tr. 20); SSR 96-2p, 1996 WL 374188, at *2. But in any event, the regulations say more weight is generally given "to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." 20 C.F.R. § 416.927(c)(5). Here, the ALJ said Dr. Sedlmeier opined Plaintiff "is significantly limited in overall functioning", and noted this conflicts with the opinions of Dr. Grubb. Dr. Sedlmeier is Plaintiff's primary care physician who referred him to Dr. Grubb, whom the record reveals is not only a cardiologist but also a nationally recognized specialist in the treatment of autonomic disorders such as neurocardiogenic syncope. (Tr. 261, 273, 369). Therefore, to the extent Dr. Sedlmeier's opinions about Plaintiff's limitations caused by his neurocardiogenic syncope are inconsistent with those of Dr. Grubb, the ALJ was entitled to defer to Dr. Grubb over Dr. Sedlmeier.

There are significant differences in the severity of restrictions placed on Plaintiff's RFC by Drs. Grubb and Sedlmeier. Dr. Grubb determined Plaintiff could stand or walk for four hours a day (Tr. 330) while Dr. Sedlmeier concluded Plaintiff could only stand or walk for less than two hours a day (Tr. 365). Dr. Sedlmeier also said Plaintiff "needs more than the normal rest breaks", has a limited ability to push or pull due to weakness, and can never climb, balance, or crawl. (Tr. 366). She reported his symptoms are severe enough to frequently interfere with the attention and concentration needed to perform simple work tasks, and he needs to spend unpredictable parts of each day lying down. (Tr. 367). None of Dr. Grubb's records or letters denote these limitations. In fact, Dr. Grubb advised physical therapy and job modification. (Tr. 330). Because the ALJ was

21

entitled to defer to Dr. Grubb over Dr. Sedlmeir when it comes to symptoms and limitations caused by Plaintiff's neurocardiogenic syncope, the ALJ did not error in failing to include the more severe restrictions suggested by Dr. Sedlmeier. Nonetheless, because the ALJ failed to follow the Commissioner's regulations on evaluating the opinion evidence of treating cardiologist Dr. Grubb, remand is necessary.

Subjective Complaints and Credibility

Plaintiff argues the ALJ failed to address Plaintiff's subjective symptoms of dizziness, fatigue, and pain. Plaintiff also argues the ALJ erred by ignoring indicia of credibility. Though these arguments are inherently related, the undersigned agrees with Plaintiff on the former but not the latter.

In assessing RFC, the ALJ "must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 576 (6th Cir. 2009) (quoting SSR 96-8p, 1996 WL 374184, at *5). However, no symptoms can be the basis for a finding of disability, "no matter how genuine the individual's complaints may appear to be, unless there are medical signs and laboratory findings demonstrating the existence of a medically determinable physical or mental impairment" reasonably expected to produce the symptoms. SSR 96-7p, 1996 WL 374186, at *1. The regulations specifically call out pain, fatigue, and weakness as symptoms that "will not be found to affect [a claimant's] ability to do basic work activities" without medical signs or laboratory findings showing a medically determinable impairment. 20 C.F.R. § 404.1529(b).

The ALJ must consider "all" of a claimant's symptoms, including pain, to the extent which they can be reasonably accepted as consistent with the objective medical evidence and other

22

evidence. 20 C.F.R. § 404.1529(a). When there is an underlying medically determinable impairment that could reasonably be expected to produce the claimant's symptoms, the ALJ must evaluate the intensity, persistence, and limiting effects such symptoms have on the claimant's ability to do basic work activities. 20 C.F.R. § 404.1529(a).

Here, the only subjective complaint the ALJ discussed was Plaintiff's occasional loss of consciousness. (Tr. 20). The ALJ said Plaintiff's "allegation of a total inability to function in a work setting is unsupported by objective medical evidence. At the most, he experiences one episode of loss of consciousness per year, lasting no more than [five] minutes." (Tr. 20). The ALJ did not discuss or apparently consider Plaintiff's subjective symptoms of fatigue, dizziness, weakness, and lightheadedness, even though they are medically established notwithstanding Plaintiff's own statements.

Though the ME testified Plaintiff's syncope does not explain his alleged pain, dizziness, or fatigue (Tr. 70), the transcript contains records from Plaintiff's ENT, Dr. Coleman, who reported Plaintiff's sinusitis causes him dizziness and fatigue. (Tr. 227). The diagnosis of chronic sinusitis was substantiated by a sinus CT in October 2005 (Tr. 235), sinus x-rays in September 2005 (Tr. 237, 241), a sinus CT in November 2005 (Tr. 231), and a brain MRI in February 2006 (Tr. 233). Furthermore, the record contains substantial evidence from Plaintiff's treating cardiologist and nurse practitioner indicating headaches, fatigue, and dizziness are, in fact, symptoms of Plaintiff's neurocardiogenic syncope, contrary to the ME's testimony.[1] (Tr. 273, 298, 328, 330). In other words,

─────────────

1. With respect to the symptoms caused by neurocardiogenic syncope, the ALJ appears to have adopted the opinion of the ME – a non-examining psychiatrist – over that of Plaintiff's treating cardiologist, "one of the country's foremost experts" in the field of neurocardiogenic syncope, without clear explanation. One record from the cardiologist's office even explicitly reported Plaintiff describes symptoms that "are consistent with neurocardiogenic syncope including headaches [and]

the ALJ could not ignore these symptoms merely because he found Plaintiff not fully credible. The ALJ failed to follow the Commissioner's regulations by not analyzing the intensity, persistence, and limiting effects of these symptoms to determine whether they required an accommodation in Plaintiff's RFC. This is another reason remand is necessary.

Plaintiff takes further issue with the ALJ's credibility determination. The "ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). An ALJ's credibility determinations about the claimant are to be accorded "great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility.' However, they must also be supported by substantial evidence." *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (quoting *Walters*, 127 F.3d at 531); *see also Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 392 (6th Cir. 2004) ("[W]e accord great deference to [the ALJ's] credibility determination."); *Villareal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987) ("the ALJ made an adverse credibility finding, and given his opportunity to observe the claimant, his conclusions should not lightly be discarded"). While it is up to the Commissioner to make credibility findings, an ALJ making an adverse credibility determination must clearly state his reasons for doing so. *Auer v. Sec'y of Health & Human Servs.*, 830 F.2d 594, 595 (6th Cir. 1987).

In this case, the ALJ determined the following regarding Plaintiff's credibility:

[Plaintiff's] allegation of a total inability to function in a work setting is unsupported by objective medical evidence. At most, he experiences one episode of loss of consciousness per year, lasting no more than 5 minutes. . . .

The undersigned cannot find [Plaintiff] to be a fully credible witness. While alleging

fatigue[.]" (Tr. 273).

24

an inability to function due to neurocardiogenic syncope, [Plaintiff] engages in a wide range of activities on a daily basis. He shops, cooks, drives, helps his children with homework, reads[,] and socializes regularly with others. [Plaintiff] maintains the household (consisting of [Plaintiff], his wife[,] and their three children) when his wife is at work (full-time). [Plaintiff] is also responsible for managing the family finances, paying bills, etc. At the hearing, [Plaintiff] testified in a clear and coherent manner. In response to a question as to how often he loses consciousness, [Plaintiff] was credible when he responded that he does so only about once a year, for no more than 1–5 minutes.

(Tr. 20).

Plaintiff argues his long and continuous past work record with no evidence of malingering, demonstrating a considerable inclination toward employment, is a factor supporting his credibility. *See Allen v. Califano*, 613 F.2d 139, 147 (6th Cir. 1980). While Plaintiff's fifteen years of continuous employment in the record (Tr. 168) does suggest an inclination toward employment, Plaintiff's testimony and other statements in the record provide substantial support for the ALJ's credibility finding. Plaintiff testified he fixes meals, showers, helps his kids with schoolwork, does laundry, sometimes does vacuuming or dishwashing, drives twice a week, socializes with friends, and goes shopping "probably once a week" though not alone. (Tr. 44, 46–51, 57). Plaintiff cites *Walston v. Gardner*, 381 F.2d 580, 586 (6th Cir. 1967), to argue these activities are not necessarily inconsistent with a disability finding, but *Walston* does not help him. There, the court said performing simple functions such as driving, shopping, dish washing, and floor sweeping "does not necessarily indicate that [the claimant] possesses an ability to engage in substantial gainful activity." *Id.* In that case, the claimant alleged he suffered intense pain with movement, and his allegations were "confirmed by every doctor who examined him." *Id.* The court reasoned "[a] man is disabled within the meaning of the Act[] if he can engage in substantial gainful activity only by enduring great pain." *Id.* But this is plainly distinguishable from the instant case, where pain is not the driving reason for Plaintiff's alleged

25

disability. Rather, Plaintiff alleges his RFC is primarily limited by other symptoms such as dizziness, lightheadedness, weakness, and fatigue. (Tr. 177, 199, 202). Furthermore, it is not the case that "every doctor who examined" Plaintiff has confirmed his allegations. For instance, even Dr. Grubb's assessment that Plaintiff could work four to six hours a day (Tr. 330) conflicts with Plaintiff's allegation of total disability from these symptoms.

An ALJ may "consider household and social activities engaged in by the claimant in evaluating a claimant's assertions of pain or ailments." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997) (citing *Blacha v. Sec'y of Health and Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990)); *see also Crisp v. Sec'y of Health and Human Servs.*, 790 F.2d 450, 453 (6th Cir. 1986) (finding substantial support for an ALJ's adverse credibility determination when the claimant testified he goes fishing, plays guitar, socializes with friends, drives on a limited basis, and goes grocery shopping, among other daily activities). As the ALJ pointed out, Plaintiff testified he drives a couple times a week. (Tr. 44). This is inconsistent with Plaintiff's allegations of disabling dizziness and lightheadedness. On an average day, Plaintiff said he spends an hour preparing dinner and about an hour total doing housework, though intermittently. (Tr. 47–49). He is also able to help his children with schoolwork for an hour or an hour and a half a day. (Tr. 48). These facts are slightly inconsistent with his allegations of disabling dizziness and fatigue, especially in light of Plaintiff's prior answer on a January 2008 Function Report in which he said it is too exhausting to cook most meals. (Tr. 198). Plaintiff also told SSA at that time that he needs to stop and rest after one to two minutes of walking (Tr. 202), but he testified he had worked up to walking around his block, which takes him "[m]ore than 30 minutes" (Tr. 44). In sum, there is substantial support in the evidence for the ALJ's adverse credibility determination.

Step Five Determination

Plaintiff argues the ALJ's hypothetical question to the VE was inadequate, and that the ALJ should have inquired into whether the VE's testimony was consistent with the Dictionary of Occupational Titles (DOT). Once again, Plaintiff's first argument here is persuasive, but his second lacks merit.

To meet his burden at step five, the Commissioner must make a finding "'supported by substantial evidence that [the claimant] has the vocational qualifications to perform specific jobs.'" *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (quoting *O'Banner v. Sec'y of Health, Education & Welfare*, 587 F.2d 321, 323 (6th Cir. 1978)). "It is well established that an ALJ may pose hypothetical questions to a vocational expert and is required to incorporate only those limitations accepted as credible by the finder of fact." *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993). "Substantial evidence may be produced through reliance on the testimony of a vocational expert in response to a 'hypothetical' question." *Varley*, 820 F.2d at 779. But if an ALJ relies on a VE's testimony in response to a hypothetical to provide substantial evidence, that hypothetical must accurately portray the claimant's limitations in order for the responsive testimony to constitute substantial evidence. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516-517 (6th Cir. 2010); *see also Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004) (explaining that although an ALJ need not list a claimant's medical conditions, the hypothetical should provide the VE with the ALJ's assessment of what the claimant "can and cannot do").

In his hypothetical, the ALJ asked the VE to assume an individual with transferrable skills from prior work at the skilled level who "is capable of doing simple, routine, repetitive tasks and other novel work functions up to and including semiskilled." (Tr. 76). In response, the VE supplied three jobs

classified as semiskilled. (Tr. 79). However, in his RFC finding, the ALJ determined Plaintiff is capable of performing sedentary work with various non-exertional restrictions and "is able to concentrate on simple routine repetitive tasks." (Tr. 19). Even though he included it in his hypothetical, and the VE apparently relied on it, the ALJ made no specific RFC finding about the skill level of work Plaintiff is capable of performing. Because of this omission, Plaintiff argues the ALJ's hypothetical was incomplete and thereby prevents the VE's testimony from being substantial support for the RFC finding.

The ALJ's RFC, on its face, is more restrictive than the limitations imposed by the hypothetical. Under the ALJ's RFC, Plaintiff can at most concentrate to perform simple, routine, repetitive tasks, while the hypothetical individual could do that plus other "novel work functions up to and including semiskilled" work. The Commissioner contends the ALJ's RFC wording "leaves open the possibility that Plaintiff might be capable of greater mental capacity." But by definition, an RFC is the *most* a claimant is capable of doing despite his limitations. 20 C.F.R. § 404.1545(a)(1); *see Griffeth v. Commissioner of Soc. Sec.*, 217 F. App'x 425, 429 (6th Cir. 2007). And this difference definitely matters because the jobs the VE supplied in response to the hypothetical are all semi-skilled. (Tr. 79). The Commissioner, perhaps realizing this problem, says this "discrepancy should not be considered problematic" because substantial record evidence supports the conclusion Plaintiff is capable of semiskilled work. But even if that is the case, it does not change the actual hypothetical asked of the VE, and without a more restrictive hypothetical, the VE's testimony cannot be used to support the ALJ's step five determination that jobs which Plaintiff could still perform exist in the economy. *See Ealy*, 594 F.3d at 516 ("In order for a vocational expert's testimony in response to a hypothetical question to serve as substantial evidence in support of the conclusion that a claimant can perform other

28

work, the question must accurately portray a claimant's physical and mental impairments."). Thus, remand is necessary for this reason also.

Plaintiff further argues the ALJ failed to comply with Social Security Ruling 00-4p by not asking the VE if his testimony was consistent with the Dictionary of Occupational Titles (DOT). Because the VE's testimony was inconsistent with the DOT, Plaintiff argues, the ALJ's failure to resolve the conflicts between the DOT and the VE's testimony is cause for remand.

The Ruling imposes an affirmative duty on the ALJ when a VE's testimony is inconsistent with the DOT:

> Occupational evidence provided by a VE or VS generally should be consistent with the occupational information supplied by the DOT. When there is an apparent conflict between VE or VS evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled. At the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency. . . .

> When vocational evidence provided by a VE or VS is not consistent with information in the DOT, the adjudicator must resolve this conflict before relying on the VE or VS evidence to support a determination or decision that the individual is or is not disabled. The adjudicator will explain in the determination or decision how he or she resolved the conflict. The adjudicator must explain the resolution of the conflict irrespective of how the conflict was identified.

SSR 00-4p, 2000 WL 1898704, at *2.

In this case, Plaintiff's attorney asked the VE, "The hypothetical . . . discussed an alternative sit/stand option. Do you agree that that is not addressed in the DOT?", to which the VE responded, "Yes, absolutely." (Tr. 80). The VE then explained that a sit/stand option may be at the discretion of the employee as long as he stays on task, but in some jobs, such as a manufacturing or production setting, the height an employee is at is controlled by the employer. (Tr. 80–81). Whether to sit or

stand at a particular job depends on the position. (Tr. 81).

SSR 00-04p requires the ALJ to elicit a reasonable explanation for a conflict between the DOT and VE testimony only when "there is an apparent unresolved conflict". SSR 00-04p, 2000 WL 1898704, at *2. Because the DOT does not contain information on a sit/stand option, the VE's testimony about a sit/stand option cannot possibly be in an apparent unresolved conflict with the DOT. *Brenneman v. Astrue*, 2012 WL 601927, at *10 (N.D. Ohio 2012) ("[T]he DOT does not contain information about whether jobs can be performed with a sit/stand option. As a consequence, courts confronted with the question have held that no conflict exists."); *Zblewski v. Astrue*, 302 F. App'x 488, 494–495 (7th Cir. 2008) ("Because the DOT does not address the subject of sit/stand options, it is not apparent that the testimony conflicts with the DOT."); *see also Buckner-Larkin v. Astrue*, 2011 WL 4361652, at *2 (9th Cir. 2011).

Plaintiff also argues the ALJ's assertion that the VE's testimony is consistent with the DOT (Tr. 22) is unsupported by substantial evidence because the ALJ never asked the VE about it. However, this error is harmless. If there is no conflict between the VE's testimony and the DOT, as is the case here, then courts are divided as to whether a mere failure to inquire about potential inconsistencies is grounds for remand or harmless error. *Bratton v. Astrue*, 2010 WL 2901856, at *3 (M.D. Tenn. 2010). Though the Sixth Circuit has not definitively resolved the issue, courts within this circuit "tend to hold that the technical error of failing to inquire does not constitute reversible error." *Id.* at *4 (citing *Wix v. Astrue*, 2010 WL 520565, at *7 (M.D. Tenn. 2010); *Fleeks v. Comm'r of Soc. Sec.*, 2009 WL 2143768 (E.D. Mich. 2009); *McEwen v. Astrue*, 2009 WL 5196061, at *4 (M.D. Tenn. 2009)). Accordingly, the ALJ did not err under SSR 00-04p.

### CONCLUSION AND RECOMMENDATION

The Commissioner's decision denying benefits is unsupported by substantial evidence because (1) the ALJ failed to properly evaluate treating source medical opinions; (2) the ALJ failed to properly evaluate Plaintiff's subjective symptoms from a medically determinable impairment; and (3) the ALJ's RFC is more restrictive than the hypothetical the VE's testimony was premised on. The undersigned therefore recommends the Commissioner's decision be reversed and the case be remanded to the Commissioner for further proceedings consistent with this opinion.

                                                    s/James R. Knepp, II
                                              United States Magistrate Judge

*ANY OBJECTIONS* to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice.  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).